# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Case No. 1:18-cv-02697-DDD-KLM

MARIA TERESA BERNAL,

    Plaintiff,

v.

DENVER HEALTH AND HOSPITAL AUTHORITY,

    Defendant.

---

## ORDER GRANTING SUMMARY JUDGMENT

Plaintiff Teresa Bernal told her employer, Denver Health and Hospital Authority, about possible disability discrimination by her colleagues against a job applicant. Several months later, Denver Health terminated her. Because Ms. Bernal cannot show that the legitimate reasons for her termination are pretextual, the Court **GRANTS** Denver Health's motion for summary judgment. (Doc. 41.)

### BACKGROUND

The facts relevant to this order are not disputed.[1] Defendant Denver Health and Hospital Authority hired Plaintiff Teresa Bernal in 2012,

---

[1] Contrary to the Court's Civil Practice Standards, Ms. Bernal has failed to respond to Denver Health's Statement of Undisputed Material Facts. *See* DDD Civ. P.S. III.E.1.d. Regardless, she did not—in her own version of the facts or by argument—contest any of the facts supplied by Denver Health. (*See* Doc. 44.) Neither does Denver Health dispute any of Ms. Bernal's facts, save one that is not material to resolving the motion. (Doc. 47.)

where she primarily worked as an interpreter in the Medical Interpretation Department under Michael Keelan, her immediate supervisor. On May 21, 2016, she resigned and moved to Texas. Subsequently, in July of 2017, on Mr. Keelan's recommendation, Denver Health retained her as a contract worker, through RightSourcing, Inc., and she worked remotely from Texas as a supervisor in the department.

### A. Ms. Bernal's Reports of Possible Discrimination

At some point Mr. Keelan suspected another Denver Health Employee of caring for her child while working from home, in violation of company policy. To investigate this, Mr. Keelan had Ms. Bernal listen to recorded phone calls involving that employee. During one call, she heard the following exchange between two Medical Interpretation Department employees, who were discussing a job applicant who apparently had trouble walking:

> **Gabi:** They, Mary, have to fill in here, look, they have to. . . . . There's a part that says how they have to fill in their profile, you know, how to put that part concerning their overall employee profile, how much they want to earn, etc.
>
> **Mary:** Uh huh.
>
> **Gabi:** And one of those points says "Perform essential functions of the job" and he put "Yes."
>
> **Mary:** Oh, okay.
>
> **Gabi:** And he put "N/A" for "Work restriction details" and "N/A" for "Accommodations."
>
> **Mary:** Okay. Okay, so he should be able to walk.
>
> **Gabi:** She says yes, that he must.
>
> **Mary:** And what if he says "No"?

**Gabi:** He says, she says. Well, if he would have put "No," there

**Mary:** No, no, no. What if he doesn't write it but when he starts working, he tells us he can't go out for a walk or that we have to give him more time?

**Gabi:** She says, because I asked her that.

**Mary:** Oh, okay, okay.

**Gabi:** She told me she had to contact Patt from [inaudible]. . .

**Mary:** Okay.

**Gabi:** . . . to ask her specific thing about what would happen . . . if this were to happen when he is already an employee.

**Mary:** Okay.

**Gabi:** At this point, it's everything, I mean, we simply have to believe what he put in there.

**Mary:** Okay, Okay. That sounds fair.

. . .

**Gabi:** Here it is. Okay. Look: your summary [inaudible] qualification, experience, [inaudible] skills and abilities, knowledge of structure, ability to communicate, grammar, knowledge, ability to read and comprehend, [inaudible] etiquette. . . . it says that [inaudible] in person at the telephone, but it doesn't say [inaudible] all the specific details about the Interpreter job description but it doesn't say absolutely anything about moving, mobilizing from one place to . . .

(Doc. 41-2, at 5–7.) Ms. Bernal believed this conversation demonstrated discrimination against a job applicant with a gait impairment. The applicant did not receive an offer.[2]

On February 21, 2018, at a meeting called for other purposes, Mr. Keelan mentioned the possible disability discrimination, based on the recorded call, to human resources personnel. Ms. Bernal "piggybacked a little bit" on the discussion. (Doc. 41-1, at 8.) Human resources personnel indicated they would look into it, and Mr. Keelan sent them transcripts of the call.[3] Neither Mr. Keelan nor Ms. Bernal ever received any feedback about the potential discrimination issue.

### B. Ms. Bernal's Rescinded Promotion and Termination

Before that meeting, in December 2017 and January 2018, Mr. Keelan had discussions with Associate Chief Operating Officer Mario Harding about creating a new manager position in the Medical Interpretation Department, and Mr. Keelan proposed promoting Ms. Bernal. On January 9, 2018, Mr. Harding tentatively agreed: "I would go with the plan you proposed in the interim and see how things go down between the 1st & 2nd Qtr of 2018. If Denver Health has fiscal challenges early on, expect decisions impacting labor/staff." (Doc. 41-8, at 1.) By January 18, Mr. Harding's view had changed slightly: "Given the staffing turnover and operational issue in [the Medical Interpretation Department] . . . I want to open the recruitment to internal and external candidates and conduct a nationwide search. I know this is different

---

[2] During the call, Gabi and Mary were apparently discussing two candidates. Ms. Bernal does not know who the other candidate for the open position was, nor does she know what that other candidate's qualifications were. (Doc. 41-1, at 19.)

[3] Mr. Keelan sent human resources sixteen transcripts, only one of which is at issue here.

than what you propose but staffing, morale (employee engagement) and operations are deteriorating." (Doc. 41-9.)

On February 12, 2018—still before Ms. Bernal had raised her perceived discrimination issue—Mr. Harding met with human resources and an employee relations investigator, who reported serious leadership concerns about both Mr. Keelan and Ms. Bernal. Complaints about Ms. Bernal included her favoritism toward one employee, her unresponsiveness, and that she lacked presence because she worked remotely. At least four follow-up meetings took place to address the problems in the department.

On March 16, 2018, Mr. Keelan announced that he had selected Ms. Bernal to fill the open manager position. On March 18, Mr. Harding expressed his disappointment to Mr. Keelan:

> Based on our last discussion regarding the [ ] position (place Teresa [Bernal] in an acting role vs. outright promoting her as the manager), I am disappointed with this decision and the fact that I was not included in the interview process. . . . From my standpoint, this does not feel right. . . .
>
> No major concerns with Teresa [Bernal] except that I am still not receiving regular reports [ ] I asked for last Fall; however, I still would have liked to interview her to assess her leadership readiness for this role. Placing her in an acting role would have allowed us to observe her leadership and management skills with this group at greater depth than where it stands today. . . . We can discuss further on Monday but how this was carried out is not sitting well with me.

(Doc. 41-15, at 3.) In a lengthy response, Mr. Keelan defended his decision, which he explained was the result of a nationwide search involving over fifty applicants.

Mr. Harding then mentioned his concerns to human resources. On March 22, 2018, Associate Chief of Human Resources Sheila Paukert said that of forty-seven applicants for the manager position, only two had been interviewed. Ms. Paukert also relayed some of the departmental complaints about Ms. Bernal. Consulting with Ms. Paukert, Mr. Harding then decided to rescind the manager position offer made to Ms. Bernal. On March 23, Mr. Harding and Ms. Paukert discussed the decision with Mr. Keelan and directed him to inform Ms. Bernal. On April 9, Mr. Keelan went on leave, and he never returned to Denver Health.

On April 12, 2018, Mr. Harding spoke with Ms. Bernal by phone to discuss his reasons for rescinding her job offer. He voiced his concerns about how she was promoted and mentioned the complaints he had received about her. Ms. Bernal asked if she could apply again, but Mr. Harding told her he would not consider her for the management role.

On April 12 and 18, 2018, after her call with Mr. Harding, Ms. Bernal exchanged e-mails with Denver Health's chief operating officer. In them, she expressed that she felt singled-out for following company policies and had not been provided corrective action before the offer was rescinded. She also mentioned it was unfair that she be punished, while there was "an employee that was part of the interview process that discriminated against a disable[d] candidate," which she felt Mr. Harding and human resources "ha[d] done nothing about." (Doc. 41-4.) The chief operating officer responded that he was "too far removed from the situation to appropriately guide" Ms. Bernal or "offer additional explanations," but he would share her concerns with Mr. Harding if she permitted him. (Docs. 41-5, 41-6.)

On April 18, 2018, Mr. Harding met with human resources to again discuss the employee complaints and problems in the Medical Interpretation Department. A new employee relations specialist—who had not been a part of earlier discussions but who had taken over investigation of complaints about Ms. Bernal—had substantiated many of the complaints made about her. On May 9, Mr. Harding met with human resources to discuss these findings. At that meeting, Mr. Harding "again expressed [his] strong view that it was not working out for Ms. Bernal to be a supervisor in the [Medical Interpretation] Department working remotely from Texas." (Doc. 41-7, at 7.) He then "finalized [his] tentative decision from April 18 to terminate Ms. Bernal's contract services through RightSourcing," and Ms. Paukert concurred in that decision on behalf of human resources. (*Id.*)

## DISCUSSION

The purpose of summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). The Court will grant Denver Health's motion "if but only if the evidence reveals no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1190 (10th Cir. 2009). The Court must view "the facts and all reasonable inferences those facts support in the light most favorable" to Ms. Bernal. *Id.* at 1189–90.

The ADA and Rehabilitation Act prohibit retaliation against individuals who have opposed any act or practice made unlawful in those Acts. 42 U.S.C.A. § 12203(a); *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010) ("The standard for retaliation claims under the Rehabilitation Act is the same as the standard for retaliation claims under the Americans with Disabilities Act."). Where

a plaintiff seeks to prove retaliation under either act using circumstantial rather than direct evidence, courts evaluate the claim using the *McDonnell Douglas* burden-shifting approach: If the employee can make a prima facie case of retaliation, the burden shifts to the employer to articulate legitimate reasons for taking an adverse employment action. If the employer can do that, the employee picks up the burden once more and can survive summary judgment by identifying evidence that could support a reasonable jury's concluding that the employer's proffered rationale is a mere pretext. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)); *see also Murray v. City of Sapulpa*, 45 F.3d 1417, 1421 (10th Cir. 1995) (noting the *McDonnell Douglas* burden-shifting analysis is a tool the courts use in analyzing summary judgment motions, which need not be strictly applied because the ultimate burden of persuasion rests upon the plaintiff). The employee can establish a prima facie case by showing: (1) that she engaged in protected activity; (2) that she suffered a materially adverse action by the employer either after or contemporaneous with her protected activity; and (3) a causal connection between the protected activity and the adverse action. *Id.*

Ms. Bernal claims that Mr. Harding's rescission of her promotion and later termination of her amounts to unlawful retaliation in violation of the Acts. These actions were clearly adverse to Ms. Bernal. But Denver Health says her reporting of possible discrimination does not qualify as protected activity and that, even if it did, there was no causal connection between her making those reports and the adverse actions. These arguments have some merit, but within the *McDonnell Douglas* framework, a plaintiff's prima facie burden is low.

Denver Health points out that objecting to conduct which the plaintiff subjectively believes to violate anti-discrimination law is not

sufficient to support a retaliation claim, even if done in good faith, if the plaintiff's belief was not objectively reasonable. *See Crumpacker v. Kansas Dep't of Human Resources*, 338 F.3d 1163, 1171 (10th Cir. 2003). Here, the overheard conversation is itself confusing and hardly definitive proof of discriminatory conduct. But there is some, though not much, additional evidence supporting that Ms. Bernal's belief was reasonable, including that Mr. Keelan agreed with her and human resources personnel saying they would look into it (even though it appears that the matter was immediately dropped). Whether this would be enough to satisfy the objective standard is unclear, but it need not be resolved given other flaws in Ms. Bernal's case.

Similarly, the Court has doubts about whether Ms. Bernal has done enough to satisfy the causation element of the prima facie case. The only real evidence she has is that her promotion was rescinded about a month after she lodged her objection, and then her termination was another month after that. There is, ideed, some dicta in Tenth Circuit cases suggesting that temporal proximity between the protected activity and adverse action may be adequate circumstantial evidence to establish prima facie causation. *See, e.g.*, *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citing *Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994), for proposition that one and one-half month period between protected activity and adverse action may, by itself, establish causation). But in *Anderson* and the cases it relies on, there does not seem to be any question that the individuals who took adverse action had knowledge of the plaintiff's protected activity. *See, e.g., Ramirez*, 41 F.3d at 596 ("Layoffs which occurred less than two months after engaging in protected activity, *along with knowledge that the plaintiffs had engaged in that activity*, were held sufficiently

probative of a retaliatory motive to withstand summary judgment.") (emphasis added; citations omitted).

Requiring plaintiffs in retaliation cases to show decisionmakers were at least aware of their protected activity is consistent with the statutory text, logic, and caselaw under similar statutes. *See, e.g.*, *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (quoting *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) (Title VII) (The "plaintiff must show that the individual who took adverse action against [her] knew of the employee's protected activity.")); *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1212–13 (10th Cir. 2018) (Federal Railroad Safety Act) ("[W]e join those courts that have concluded an FRSA plaintiff advancing a retaliation claim must demonstrate the decisionmaker had knowledge of the protected activity."). Denver Health is correct that there is no evidence that Mr. Harding, the decisionmaker responsible for both adverse actions, was ever aware that Ms. Bernal reported potential discrimination. This also seems to be a potentially fatal flaw.

Ultimately, however, the Court need not decide whether Ms. Bernal has successfully made out a prima facie case because it's clear that Denver Health's legitimate reasons for rescinding her promotion and later terminating her were not pretextual. Mr. Harding viewed Mr. Keelan's selection of Ms. Bernal for the manager position as insubordinate. He spoke with Ms. Paukert and others in human resources on multiple occasions about staff complaints concerning Ms. Bernal—including her lack of communication, unresponsiveness, unsupportiveness, favoritism, and fear of retaliation by Mr. Keelan if one said something to her. Because of his "deep disappointment in the process by which Mr. Keelan had appointed Ms. Bernal as Manager and because of the concerns that had been raised about Ms. Bernal as a leader," Mr. Harding decided to rescind the offer. After more meetings with human resources concerning

the turmoil in the Medical Interpretation Department, which included discussions of the numerous complaints about Ms. Bernal, many of which were substantiated after formal investigation, Mr. Harding decided to terminate her. He also decided that Ms. Bernal working remotely from Texas was not working for the department.

Ms. Bernal has failed to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that render Mr. Harding's reasons for both adverse actions unworthy of credence. *Anderson*, 181 F.3d at 1179. She principally argues that the complaints against her were meritless, that human resources failed to investigate the potential discrimination, and that other employees should have been disciplined for what Ms. Bernal believed to be true abuses in the department. Even if so, none of these circumstances are material to the question before the Court, nor do they cast any doubt on Mr. Harding's deliberate process, which did not factor in the single discrimination allegation by Ms. Bernal that the record does not show he even knew about. And importantly, many of the complaints about Ms. Bernal that factored into Mr. Harding's decision pre-date the meeting during which she raised her concerns of discrimination. Ms. Bernal's mere "conjecture that [Denver Health's] explanation is pretext is insufficient to defeat summary judgment." *Id.*

## CONCLUSION

For the foregoing reasons, Denver Health's motion for summary judgment (Doc. 41) is **GRANTED**. This case shall be closed.

Dated: February 5, 2020.    BY THE COURT:

　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　Daniel D. Domenico
　　　　　　　　　　　　　　　United States District Judge